**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Ekbal Khan,**

*Plaintiff,*

**v.** **Case No. 3:18-cv-182**
**Judge Thomas M. Rose**

**Canonical USA, Inc., et al.,**

*Defendants.*

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, ECF 19, AND TERMINATING CASE.**

---

Pending before the Court is Defendant's Motion for Summary Judgment. ECF 19. Plaintiff Ekbal Khan does not oppose the request for complete dismissal by three of four Defendants: Michael Kress, Chris Kenyon, and Jason Bobb. Further, Plaintiff does not oppose the request for dismissal against Defendant Canonical USA Inc., of Plaintiff's claims of Hostile Work Environment under federal law, Retaliation under federal law and Retaliation under Ohio law. The only claims remaining in dispute are claims against Canonical for Race Discrimination under state and federal law and National Origin Discrimination under state and federal law. ECF 23 n.1. Because Plaintiff is neither able to come forward with direct evidence of discrimination, nor able to create a prima facie case of such, nor able to refute Defendant's stated non-discriminatory reason for dismissing Plaintiff, Defendant's motion will be granted.

## I. Background

Defendant Canonical USA Inc., recruited Plaintiff Ekbal Khan, a native of India, from its competitor, Red Hat, hiring him on August 3, 2015. (Plaintiff Depo. at 16-17; 31). Prior to Plaintiff joining them, Canonical did not receive any revenue in the Americas in telecommunications sales from two of Plaintiff's largest pre-existing clients – Verizon and CenturyLink. (Kenyon Depo. at 27-28). Plaintiff also brought other clients with him to Canonical, including AT&T, Sprint, T-Mobile, TELUS Communications, Rogers Communications, Comcast Cable, Level 3 Communications, and Cincinnati Bell Technology Solutions. (Id. at ¶5).

Upon his hire at Canonical, Plaintiff was assigned a sales quota of $2 million. (Plaintiff Depo. at 24; Deposition of Michael Kress at 37). The job description for Plaintiff's position called for a $1.5 million quota (Kenyon Depo. at 41 and Plaintiff's Depo. at Ex. C). No one in sales at Canonical ever had a higher starting sales quota than Plaintiff. (Kress Depo. at 45). Plaintiff's quota eventually rose to $4 million prior to his termination. (Kenyon Depo. at 43).

Ryan Wolfrum assumed some of Plaintiff's job responsibilities after Plaintiff was terminated. (Interrogatory Responses at number 10 at 10). Wolfrum is Caucasian (Id. at number 19, at 17). Wolfrum's sales quota for 2016-2017 was $500,000 and for 2017-2018 was $950,000 –less than Plaintiff's $4 million quota for this period. (Id. at number 18, at 16). Brian McDonald, who assumed Plaintiff's other major client, never had a quota above $2.7 million. (Plaintiff Depo. at 47-48; Interrogatory Responses at supplement at 36; Deposition of Jason Bobb at 35). He is also Caucasian. (Interrogatory Responses at number 10, at 10). No one was hired to replace Plaintiff, however.

Canonical argues that Plaintiff's high quota resulted from his high salary and high bonus potential. (MSJ at 6 n.6)). Plaintiff's ending salary was $163,200 with a bonus potential of up to $142,800. (Interrogatory Responses at number 9 at 9). Wolfrum, whose quota was only 1/4th of Plaintiff's, had a salary of $140,000 with a bonus potential of $140,000. (Id. at number 10, at 10). McDonald's salary was roughly the same as Woflrum's. (Plaintiff Dec. at ¶6). He had a bonus potential of $140,000. (Bobb Depo. at Ex. 9). Plaintiff asserts that his quota caused him to be far more aggressive with customers in an attempt to meet the quota, as he had to close deals quickly and then move on. (Plaintiff Dec. at ¶7).

When Plaintiff was recruited, Canonical's Christopher Kenyon told Plaintiff that he would be the head of the sales team for telecommunications in North America. (Plaintiff Depo. at 33). However, upon hire, Plaintiff was placed under Mike Kress. (Id. at 33-34). Plaintiff reported to three different supervisors during his tenure at Canonical: he reported to Mike Kress from August 3, 2015 to September 30, 2015; Chris Kenyon from October 1, 2015 to August 31, 2016; and Jason Bobb from September 1, 2016 to April 11, 2017. (Khan Depo. 26-27). Plaintiff worked out of his home, as did the majority of Canonical's employees. (Khan Depo. 19; Bobb Depo. 150). Kress was Vice President of Sales (Kress Depo. 15-16); Bobb was head of Sales in Americas (Bobb Depo. 20); and Kenyon was Vice President of Cloud Sales. (Kenyon Decl. ¶2). Both Kress and Bobb reported to Kenyon. (Khan Depo. 241). Kenyon reported to Anand Krishnan (a "senior leader" who was the head of sales at Canonical), who in turn reported to CEO, Jane Silber. (Id. at 29-31). Krishnan is also Indian. (Kenyon Depo. 65).

Kress often verbally pointed out to Plaintiff that he was from India, and as a result, he was different from most at Canonical and may not fit-in. (Id. at 41-46). Kress criticized almost every

aspect of Plaintiff's job performance. Kress had issues with Plaintiff's planning a trip to California to meet with business contacts at Verizon. (Id. at 97). Kress criticized not only that Plaintiff arranged for the trip within a week of its occurrence, but also that Plaintiff arranged to fly from Ohio to California the day before the meeting to adjust and prepare for it. (Kenyon Depo. at Ex. 38). Moreover, Plaintiff travelled to California for three days for one customer meeting. (Kress Depo. 39, 55; Ex. 38; Kenyon Depo. 110-12).

The short notice California trip violated Canonical's travel policy, which mandates at least seven days' notice. (Kress Depo. 40). This is for two basic reasons: 1) booking travel in advance saves money, and 2) objectives of the trip could be discussed to ensure resources were used properly. (Kress Depo. 41). Kress found: Plaintiff "abuse[d] the travel expense and time policy." (Ex. H, p. 2; Id.). Plaintiff admits he should have told Kress about the trip before he went. (Khan Depo. 95-96).

On Friday, September 18, 2015, during the California trip, Plaintiff had a deadline to submit a major client proposal for a company named Level 3. Plaintiff "disappeared" on the day of the proposal submission. (Kress Depo. 43, 46-48). Plaintiff was not online and not otherwise available that day. (Khan Depo. 102). Kress called, texted and emailed Plaintiff, but he never responded. (Kress Depo. 47-48). Plaintiff claims that he submitted the proposal on Friday, and then took the rest of the day off. (Khan Depo. 97-98). Plaintiff failed to provide an explanation. (Kenyon Depo. 70-71).

Kress and Kenyon cancelled their plans for the day to address the submission. (Kress Depo. 62; Kenyon Depo. 118). Several employees had to work through the night to assist. (Id. at 111). Plaintiff admits that the customer was not happy with the proposal. (Khan Depo. 100). While

ultimately, Canonical was awarded the contract with Level 3, Kenyon believed that there was a "lack of honesty" that was a "very significant warning sign to us about him." (Kenyon Depo. 71, 111).

By October 26, 2015, Kress drafted a Performance Improvement Plan in conjunction with HR. (Kress Depo. 67-68; Ex. G). The Performance Improvement Plan ranked Plaintiff below average in most categories and extended Plaintiff's probationary period. (Ex. G). Kress "didn't necessarily see a lot of redeeming qualities that was going to help us with Plaintiff long-term, even from that early stage." (Kress Depo. 71). He sized up Plaintiff's overall attitude: "I don't really care what you think … I'm going to just kind of do whatever I want." (Id. at 50). Kenyon did not disagree with Kress' rankings. (Kenyon Depo. 93). But the Performance Improvement Plan was never given to Plaintiff; instead, Kenyon decided to transfer Plaintiff's supervision from Kress to himself. (Id. at 92-94, 117). Plaintiff was pleased with the change because he did not want to work for Kress. (Khan Depo. 78, 81).

Kenyon became Plaintiff's direct supervisor in October of 2015 and remained in that position until May of 2016. (Kenyon Depo. at 92, 95). During this time, Plaintiff had personality conflicts with co-workers James Troup, Dan Poler, and Jason Tally. Troup "cussed out" Plaintiff on a phone call, and Plaintiff took exception to it. (Plaintiff Depo. at 143). Kenyon admitted that he did not ascribe blame to Plaintiff (or anyone else) regarding the Troup incident. (Kenyon Depo. at 69). While Plaintiff was not formally disciplined for the situation involving Poler, Poler criticized Plaintiff for not using his assigned solution architect, "the result being the cycle of poorly structured and unsupportable deals will continue." (Ex. R). (Kenyon Depo. at 68).

Jason Talley, a solutions architect manager, criticized Plaintiff for not having extra personnel on a call with a client (who would have technical knowledge about Canonical's products). (Kenyon Depo. at Ex. 48). On March 28, 2016, Talley, a solutions architect manager, sent an email to Kenyon and Poler flagging that Plaintiff was on a customer call with Verizon (a major customer), "and he is quite frankly embarrassing […] he doesn't know our products." (Khan Depo. 172-73; Ex. Q). Talley expressed frustration that Plaintiff was unhappy with his previous solutions architect, Plaintiff was assigned a new architect, and then Plaintiff did not utilize the new person during the call. Id.

In May of 2016, Kenyon assigned Jason Bobb to manage Plaintiff in telecommunications sales in North America. (Bobb Depo. at 62). By October 19, 2016, Bobb issued a Performance Improvement Plan to Plaintiff (Ex. CC) for three reasons: 1) Plaintiff's poor sales results; 2) customer complaints; and 3) a mistrust in what he was doing. (Bobb Depo. 91). As for sales results, Khan had sold $688,000 of a $1,000,000 quota for the first quarter of 2017; and $10,000 of a $1,000,000 quota for the second quarter of 2017. (Id. at 92-93). Additionally, Plaintiff had achieved only 56% of his sales funnel goal (anticipated future sales). (Id. at 94). CenturyLink's issues are also captured in the Performance Improvement Plan. (Id. at 95-98, 178-79). CenturyLink complained Plaintiff would manipulate customers to purchase services from Canonical in the way he wanted, in order to get paid quicker. (Id. at 103-04). Plaintiff would not take responsibility for what was happening with his accounts and he would ask others to answer questions he should know. (Id. at 106-07). Kenyon reviewed the Performance Improvement Plan before it was issued. (Kenyon Depo. 104).

Bobb set four improvement goals for Plaintiff. (Ex. CC, p. 2). Plaintiff provided a response to the Performance Improvement Plan's goals as requested (Ex. DD), but did not meet all four goals. As for the first goal that requested the opening of two "net new accounts," Plaintiff identified four preexisting customers, not "net new." (Bobb Depo. 109-15). As for the second goal, Bobb requested that Plaintiff introduce him to three "net new relationships." Plaintiff listed thirteen individuals in response to this goal, but only introduced him to one (Bobb was introduced to Lisa McNew, of Verizon but that is only because she complained about Plaintiff and had him removed from the Verizon account). (Id. at 116-20). As for the third and fourth goals, which related to sales figures, Canonical handed Plaintiff a "blue bird," which was a Dell/Verizon sale that Plaintiff reaped the benefits of, but had nothing to do with the procurement of the opportunity. (Id. at 100-01, 218). While Plaintiff completed the third and fourth goals of his Performance Improvement Plan by virtue of the Dell/Verizon deal, he still did not address the concerns regarding development of new business. (Kenyon Depo. 107-08). Bobb communicated with HR, and since Plaintiff met some of his goals, Bobb did not extend his Performance Improvement Plan. (Bobb Depo. 122-25).

Prior to Plaintiff's hire, Canonical had an existing telecommunications account with Bell Canada. (Kress Depo. at 24-25). However, Bell Canada became upset with Canonical's "attention, focus, quality and speed" regarding the services it was providing Bell Canada. (Plaintiff Dec. ¶12, Ex. 38). While internal emails reveal that Canonical personnel believed that such complaints resulted from Bell Canada's "unreasonable expectations," (Id. at ¶13, Ex. 4), Bobb blamed Plaintiff for Bell Canada's issues with "attention, focus, quality and speed" in customer

relations. Bobb testified that these concerns should have been included in Plaintiff's performance improvement plan, but inadvertently were not. (Bobb Depo. at 161).

Later, CenturyLink became displeased with Canonical. While CenturyLink signed a contract and purchase order with Canonical before Plaintiff was taken off the account, (Id. at 131), CenturyLink personnel made complaints that Plaintiff "had his own agenda" and that their experience "has really soured [their] relationship with Canonical sales." On June 16, 2016, a high-level employee of CenturyLink emailed Kenyon expressing concerns about Plaintiff and asking that he be removed from the account. (Kenyon Decl. ¶8; Ex. A). Plaintiff was removed from this account. (Bobb Depo. at 177-179).

Next, Verizon became displeased with Canonical. Prior to Plaintiff's hire, Canonical had not generated revenue from Verizon related to Telecommunications sales in the Americas. (Kenyon Depo. at 27). Plaintiff brought his Verizon contacts to Canonical. (Plaintiff Dec. at ¶15). As with CenturyLink, Plaintiff experienced no complaints with this branch of Verizon while he was at Red Hat. (Id.). Kenyon received a call from Lisa McNew, a senior member of the commercial team at Verizon, and she indicated that Verizon wanted to continue to do business with Canonical, but they wanted Plaintiff removed as their account manager. (Kenyon Depo. 57-58). McNew indicated that there were a list of outstanding issues, and the collective decision was made by Verizon to request Plaintiff's removal from the account. (Id. at 58-59). McNew reduced her request to remove Plaintiff to writing in the form of an email to Kenyon. (Ex. EE). Verizon indicated that another reason motivating the request for an account interface change was that Plaintiff was pushing his own "agenda" (i.e. being overly aggressive). (Bobb Depo. at 196-97). McNew of Verizon made a complaint about Canonical, requesting a change in account

interface due to Canonical's lack of "urgency, engagement, attendance, and consistency." (Bobb Depo. at Ex. 21, Canonical 000597). Plaintiff was removed from this account. (Bobb Depo. at 177-79).

A few weeks after Canonical replaced Plaintiff with Wolfrum on this account, a major agreement was executed between Canonical and Verizon that paved the way for formal business relations. (Kenyon Depo. at 138-139).

Bobb decided to terminate Plaintiff in April of 2017. (Bobb Depo. at 81, 228). According to Bobb, the separation was based on Plaintiff's performance. (Id. at 222). Bobb made the decision to terminate Plaintiff less than one week after McNew complained about him. (Bobb Depo. 228; Ex. 24). Bobb admits he was the decisionmaker, although he received input from Kenyon, along with approval from his supervisor, Anand Krishnan and HR. (Id.) Bobb's reasons for terminating Plaintiff reflect the concerns outlined in the Performance Improvement: 1) deficient sales results; 2) customer complaints; and 3) "a mistrust in what he was doing." (Bobb Depo. 91, 222, 228; Ex. II). Canonical was implementing a global reduction in force during the same time period. In April 2017, Canonical laid off 212 employees worldwide, across any number of business units and departments. (Kenyon Decl. ¶11). Bobb supervised approximately twelve salespersons in the Americas, and half of them were laid off, including Plaintiff. (Id.; Bobb Depo. 22-23, 28-30; Khan Depo. 246-49).

Prior to the reduction in force, Bobb hired five people between June of 2016 and April of 2017 when Canonical had its reorganization. (Id. at 28). Canonical concedes, and Bobb admits, that the decision to terminate Plaintiff was based on performance reasons. (MSJ. at 12; Bobb Depo. at 222, 228). While Plaintiff's termination was ultimately rolled into a company-wide

reorganization, Plaintiff was going to be terminated notwithstanding the re-organization. (Bobb Depo. at Ex. 34). Kenyon was clear that Plaintiff's "career at Canonical was over." (Kenyon Depo. at 128-129).

On May 24, 2018, Plaintiff filed a complaint against Canonical USA, Inc., Michael Kress, Christopher Kenyon, and Jason Bobb. He is still pursuing claims for Race Discrimination under federal law, National Origin Discrimination under federal law, Race Discrimination under Ohio law, and National Origin Discrimination under Ohio law. ECF 1, 23 n.1.

## II. Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. at 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. at 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

## III. Analysis

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It is a violation of Title VII to take an adverse employment decision against an employee because of his or her membership in a protected class. See, e.g., *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). Because the Sixth Circuit has recognized that the standards applicable to Title VII and Ohio Revised Code § 4112 claims are the same, the Court will address these claims together. *Laderach v. U-Haul*, 207 F.3d 825, 828 (6th Cir. 2000).

Plaintiff asserts Defendant discriminated against him because of his race and national origin. In spite of Plaintiff having pleaded separate claims of race and national origin discrimination, "Title VII does not permit plaintiffs to fall between two stools when their claim rests on multiple protected grounds." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014); *Coffman v. U. S. Steel Corp.*, 185 F. Supp. 3d 977, 982-83 (E.D. Mich. 2016) ("Plaintiff's discrimination claim is 'intersectional' because it is based on the combination of her race and gender, rather than on her race and/or gender separately."); *Thompson v. City of Columbus*, 2014 WL 1814069, at *4 (S. D. Ohio May 7, 2014) ("Sex-plus" discrimination, defined as discrimination based on sex plus some other characteristic, is "widely recognized.").

A plaintiff may establish a claim of discrimination either by presenting direct evidence of discrimination or by presenting circumstantial evidence that would support an inference of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). Evidence that would require the jury to infer a fact is not direct evidence. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078,

1081 (6th Cir. 1994). Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are disabled." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998); see also *In re Rodriguez*, 487 F.3d 1001, 1008-09 (6th Cir. 2007) (plaintiff had direct evidence of discrimination where a decision-maker stated that the plaintiff would not receive a promotion because of his Hispanic speech pattern and accent). The discriminatory statement must bear some connection to the adverse action. See, C*esaro v. Lakeville Cmty. Sch. Dis*t., 953 F.2d 252, 254 (6th Cir. 1992).

An isolated comment by a member of the employer's hiring committee that they "wanted a grass roots *guy*" does not constitute direct evidence of discrimination "because the critical inquiry [in a sex discrimination case] is whether gender was a factor in the employment decision at the moment it was made." *White v. Columbus Metropolitan Housing Auth*., 429 F.3d 232, 239 (6th Cir. 2005) (citations and internal quotations omitted, emphasis added). Similarly, generalized comments by an employer's managers about reducing their workforce's average age does "not constitute direct evidence of age-based bias against th[o]se particular plaintiffs." *Rowan v. Lockheed Martin Energy Systems, Inc*., 360 F.3d 544, 548 (6th Cir. 2004).

Here, Plaintiff concedes he has no direct evidence of discrimination (Khan Depo. 39-44, 48-49), relying instead on the *McDonnell Douglas*, 411 U.S. 792, 802-04 (1973), burden-shifting paradigm. Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), when a claim is based on circumstantial evidence, a plaintiff must first establish a *prima facie* case of discrimination, the elements of which vary slightly depending on the theory asserted. Plaintiff must establish the first prong of a *prima facie* case by showing that he: (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and

(4) that a similarly situated non-protected employee received preferential treatment or that he was replaced by someone outside of his protected class. *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 501 (6th Cir. 2007).

Plaintiff can satisfy this prong by showing that he was replaced by someone outside of his protected class or, that he was treated differently than similarly situated employees. See, *Abdulnour*, 502 F.3d 496 Here, Plaintiff argues that he was replaced by Caucasian employees McDonald and Wolfrum. See *Skelton v. Sara Lee Corp*., 249 F. App'x 450, 456–57 (6th Cir. 2007) ("[W]here an employee's position is eliminated pursuant to a reduction in force ('RIF') or reorganization, the analysis with regard to the fourth element differs because the employee is not replaced."); see also *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."). Plaintiff has not shown that he was replaced by someone outside of his protected class. He was not replaced; his responsibilities were redistributed.

Plaintiff also asserts that he was treated differently than similarly situated employees, pointing out that his sales quota was higher. For an individual to be similarly situated to a plaintiff, a plaintiff must demonstrate that his proposed comparator is nearly identical to him in all relevant aspects of the employment situation. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Generally, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating

circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis added).

Plaintiff has not come forth with sufficient evidence to base a prima facie case on differing quotas. No concrete evidence is provided with regard to the potential of the various accounts Plaintiff serviced that were doled out to more than one successor. They were quotas from different years with different economic expectations. They were dispersed among co-workers whose other responsibilities are not detailed. Nor is it easy to account for how expectations may have been diminished by Plaintiff's successes and failures in managing the accounts.

Plaintiff is adamant that no reduction in force analysis is needed, as Canonical decided to terminate him prior to deciding upon its reduction in force. The two events happened sequentially. Nevertheless, when a reduction in force is involved, the fourth prong is modified. Plaintiff must show that the employer singled him out for discharge for impermissible reasons, as the employee is not "replaced" after a reduction in force. *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). Under prong (4), Plaintiff must show that he was treated differently than similarly situated employees of a different race. *Romans v. Michigan Dep't of Human Servs.,* 668 F.3d 826, 837 (6th Cir. 2012). There is no evidence that this took place either.

The individuals who replaced Plaintiff were already working for Canonical: McDonald was hired in March 2016, and Wolfrum was hired in August 2016. (Khan Depo. 47-48). They assumed some of Plaintiff's workload when he was terminated; they were not hired to replace him. This does not constitute "replacement" for purposes of a fourth prong analysis. *Golden v. Mirabile Investment Corp.*, 724 Fed. Appx. 441, 447 (6th Cir. 2018) (internal citations omitted) ("[A] person

is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees …")

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for its adverse action. If the defendant satisfies its burden, the burden shifts back to the plaintiff to identify evidence from which a reasonable jury could find that the stated reason is a pretext for discrimination.

Even if Plaintiff could establish a prima facie case, Canonical provided legitimate reasons for terminating Plaintiff's employment. Plaintiff has offered minimal evidence why the reasons put forth are pretexts for discrimination. He cannot show that the reasons for his removal: 1) had no basis in fact; 2) were not the actual reasons; or, 3) were insufficient to explain the decision. *Manzer v. Diamond Shamrock Chems. Co*., 29 F.3d 1078, 1084 (6th Cir. 1994).

A court "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods*., 263 F.3d 595, 600 (6th Cir. 2001). However, not every evidentiary conflict regarding an employer's nondiscriminatory reason entitles a plaintiff to a trial. Rather, the circumstances of the conflicting evidence must suggest that the employer acted for discriminatory reasons. *Braithwaite v. Timken Co*., 258 F.3d 488 (6th Cir. 2001). Plaintiff is required to show "more than a dispute over the facts upon which the discharge was based." Id. at 494. Plaintiff must show that Canonical did not "honestly believe" in the stated reason. *Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001) ("As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.")

An employer can demonstrate that its belief in its purportedly legitimate and nondiscriminatory reason is "supported by particularized facts after a reasonably thorough investigation." *Davis v. City of Clarksville*, 2012 U.S. App. LEXIS 14481, *24-25 (6th Cir. July 13, 2012); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 709 (6th Cir. 2006).

Canonical's stated reasons for terminating Plaintiff were deficient sales results, customer complaints, and "a mistrust in what he was doing." (Bobb Depo. 91, 222, 228; Ex. II). The CenturyLink complaint states that "[Plaintiff] has failed to listen when we have explained what our next steps are from the CenturyLink side." (Kenyon Decl. ¶8; Ex. A). "[Plaintiff] at times ignored or changed things to match his wants." Id. "[We] asked [Plaintiff] to continue working solely with the two of us as Zubin is still out of office for a family matter. [Plaintiff] has escalated to Zubin multiple times…." Id. Verizon expressed concerns that "the sense of urgency, engagement, attendance and consistency on the account team has been less than satisfactory." (Ex. EE).

An employer has no obligation to "investigate a customer complaint that it finds plausible on its face" or permit the employee "an opportunity to present his version of the incident." *Fitzgerald v. Roadway Express, Inc.*, 2003 U.S. Dist. LEXIS 19154, *17-18 (N.D. Ohio Oct. 10, 2003) (citing *Crawford v. Broadview Savings & Loan Co*., 878 F.2d 1436, 1989 U.S. App. LEXIS 9921, *16 (6th Cir. 1989) (holding that the employer's lack of in-depth investigations into customer complaints or its deviations from standard disciplinary procedures were insufficient to establish that the employer's termination was race related or pretext)). An important customer's complaint provides an "overriding justification for [an employee's] discharge." *Whitten v. Fenner Dunlop Conveyor Sys. & Servs*., 2013 U.S. Dist. LEXIS 104958, *38 (S.D. Ohio July 26, 2013)

adopted at 2013 U.S. Dist. 14 LEXIS 128947 (S.D. Ohio Sept. 10, 2013). Plaintiff cannot demonstrate pretext.

In determining whether Canonical had an "honest belief" in its reason, the Court examines whether Bobb established a "reasonable reliance" on the particularized facts available to him. *Braithwaite*, 258 F.3d at 494. "The critical inquiry is whether Defendants made a 'reasonably informed and considered decision.'" Id., quoting *Smith v. Chrysler Corp*., 155 F.3d 799, 806-07 (6th Cir. 1998). "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." Id. See also *Abdulnour* (affirming summary judgment for employer where decisionmaker had before him complaints about plaintiff's inadequate job performance and demeaning treatment of others, and where decisionmaker personally observed that plaintiff failed to address problems that were his responsibility). A decision is insulated by the honest belief rule even when the employer has numerous reasons for the Plaintiff's removal, but only tells the Plaintiff he was being terminated for a "personality conflict," and not poor performance; and were "skeptical of undocumented accounts of employee conduct that may have been created post-termination." Id. at 503.

Here, the record evidence is undisputed that two major customers complained about Plaintiff. High-ranking Canonical employees complained about Plaintiff's performance and reduced these complaints to writing. Kress, Kenyon and Bobb all had difficulties supervising Plaintiff. Kress worked with HR in drafting a Performance Improvement Plan that identified performance deficits, but was not issued because of a change of supervision. Bobb issued a Performance Improvement Plan to Plaintiff. Plaintiff's mere disagreement with Bobb's business

reasons is insufficient as a matter of law to prevent summary judgment. See, e.g., *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627 (6th Cir. 2006).

## IV. Conclusion

Because Plaintiff has no direct evidence that race or national origin animus motivated his termination, cannot show that he was treated differently and cannot disprove the stated non-discriminatory reasons as pretext, Defendant's Motion for Summary Judgment, ECF 19, is **GRANTED**. The Clerk is **ORDERED** to **TERMINATE** the instant case from the dockets of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Wendesday, November 20, 2019.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE